Memorandum of Decision
I. Procedural History
This is an action for Termination of Parental Rights brought by the child's mother to the Probate Court for the District of Glastonbury pursuant to General Statutes § 45a-715, seeking to terminate her own parental rights as well as those of the male biological parent (hereinafter called Steven J., a/k/a Angel R., or "the father"[2]). The petitioner, Erin, was fifteen years of age at the time of the petition and was living in a Department of Children and Families foster home. Erin, prior to the birth of the child, Courtney, on November 27, 1995, recognizing her youth, her limitations as a prospective parent, and the circumstances of CT Page 7686 her pregnancy, appropriately entered into a plan to place the child with a loving, caring, stable, and safe family who wished to adopt the child. Erin, the mother of the child, worked with the Lutheran Social Services of New England, Inc ("LSS") to find an appropriate family to raise Courtney. The prospective adoptive parents agreed to certain exchange of information and post-adoptive contact between biological mother and child. The birth mother thereafter signed a consent to terminate her parental rights. The male biological parent opposed the termination of his parental rights. An action was instituted in the probate court to terminate his parental rights.
From the decree of the Hon. Donald L. Hamer, Judge of Probate, terminating his parental rights, the respondent appealed for a trial de novo to the Superior Court for the Judicial District of Hartford. The case was thereafter referred to the Child Protection Session of the Superior Court for Juvenile Matters and was assigned for trial on June 9 and 10, 1998. The Lutheran Social Service agency was permitted to intervene for disposition purposes only (Foley, J.). The parties appeared with counsel and were at issue. The court has heard the testimony of the petitioner, Erin; Steven J., the male biological parent; Jane Coughlin, the LSS caseworker; Bruce Freedman, a clinical psychologist; Lydia Polanco, a social worker for the Department of Children and Families("DCF"); Elaine Byrne, the respondent father's adult probation officer, and Jean Marie J.(hereinafter called Ms. J.), the mother of the respondent. Without objection, the court received various documents into evidence which it has thoroughly reviewed. Based upon the testimony and documents in evidence, the court makes the following findings by clear and convincing evidence.
II. Findings of Fact:
The child Courtney is presently two and one half years of age and resides with her prospective adoptive parents. Courtney was born, full term on November 27, 1995. The child's mother was born on April 24, 1980. The mother is the product of a divorced family; she was sexually abused by her mother's father, she had suffered emotional and physical abuse herself and, as an early teenager, had been placed in the Elmcrest Psychiatric Institute for a year, according to the affidavit attached to the petition. It is clear from the testimony that Erin met Steven, the male biological parent, while in the Capital Region Education Council program("CREC"), a residential treatment program for troubled CT Page 7687 youngsters, after her discharge from Elmcrest. Steven says he met Erin through his best friend who was dating Erin. On one occasion, while Steven's best friend and Erin's boyfriend was in Florida, Steven, who may have been eighteen at the time, had sexual intercourse with fourteen year old Erin. Unbeknown to Erin at the time, this isolated act resulted in her pregnancy with Courtney.[3]
When Erin learned of her pregnancy, she arranged for the adoption of her child through the Lutheran Social Service Agency. She believed she was pregnant by her boyfriend, Benjamin. Late in the pregnancy, on October 4, 1995, she disclosed the sexual relations with Steven J. to the LSS social worker, Jean Coughlin. Coughlin is a licensed clinical social worker with years of experience counseling women in "birth parent counseling and unplanned pregnancies." She discusses various options available to the birth parents.
Ms. Coughlin testified that Erin consulted with her in June of 1995. Erin, who was then just fifteen years of age, felt she was too young to parent. She wanted to select a family for adoption of her child. She also wished to have some post-adoptive contact with the adoptive family and her child.
When Ms. Coughlin learned that Steven was a possible father, she instructed Erin to make inquiry of her friends concerning the whereabouts of Steven. Ms. Coughlin contacted the department of motor vehicles for an address without success. She checked various telephone directories and wrote letters to several addresses including the mother of Steven J. She testified that she knew it was critical to notify fathers ". . . since they have equal rights and they need to have their say and be involved in the planning." The letters were sent on October 31, 1995. Steven's mother admits to receiving the letter on November 8, 1995.
Steven's mother did not disclose to Ms. Coughlin that Steven was at the time incarcerated in New Jersey and that she had regular contact with him. "I didn't feel it was necessary for her to know that Steven was incarcerated," she testified. She did contact her son in prison and notify him of the LSS letter. On November 14, 1995, Steven's mother called LSS but refused to disclose Steven's location. Ms. Coughlin told her that it was critical that Steven contact LSS. Ms. Coughlin told Steven's mother about the child and the proposed adoption. Steven CT Page 7688 testified that his mother did tell him about the letter from LSS advising him of the possibility of his paternity. He said he thought it had to do with A.I.D.S.[4] or something. He testified that he had access to a phone and could have made a collect call to LSS, but he did not. He could have written to them, but he did not.
On the day of the birth of Courtney, November 27, 1995, Ms. Coughlin called Steven's mother in the morning. She left a message on the mother's answering machine. Blood tests had ruled out Erin's boyfriend as the father. Ms. Coughlin called Steven's mother again in the afternoon indicating that it was necessary to know Steven's blood type. The mother did not return either call. Steven testified he was told of the child's birth by his mother but he did not call LSS. He later told Ms. Coughlin that he was too busy with other matters.
Ms. Coughlin testified she called Steven's mother on November 28th, morning and afternoon. She called again on December 28th, morning and afternoon and once again on December 29, 1995. On the following day, December 30, 1995, Steven's mother called Ms. Coughlin collect at her home. Ms. Coughlin testified that Ms. J. wanted to know where the child was; she wanted the child handed over to her at once. She said she would go get the baby. She was crying, threatening and demanding. She would not disclose the location of her son.
On January 5, 1996, Ms. J. called Ms. Coughlin again at home, collect. Ms. Coughlin repeated the now common refrain that she must talk to Steven. She told Ms. J. that she would no longer accept collect calls from her, but that she would accept collect calls from Steven. Steven said he was released from the New Jersey prison and returned to Connecticut on January 26, 1996, two months after the birth of the child. He had still not contacted LSS to express his position, to provide medical information, to affirm or challenge his paternity, or to inquire as to the well being of the child.
On February 13, 1996, LSS got a call from Steven in which he left the telephone number of his mother. Ms. Coughlin called the number and talked to Steven's mother. Ms. J. said that Steven was now in the state and was ;'staying with friends" and that she would let him know of the call.
On February 14, 1996, Ms. Coughlin received a call from the CT Page 7689 Department of Children and Families. A caseworker who was checking Department of Correction records had come across the name of Steven J. as a person incarcerated at the Hartford Correctional Center. Ms. Coughlin call the correctional center and arranged to visit Steven in jail on February 26, 1996. Steven testified that after his release from New Jersey, he returned to Connecticut on January 26, and on February 5, 1996 turned himself in to Connecticut authorities on an outstanding warrant for his arrest.
There are several discrepancies in the testimony, some of which are complete contradictions. They arise regarding conversations between Ms. Coughlin and Ms. J., Ms. Coughlin and Steven, and communication or lack of communications between Steven and his mother. The court finds the account of the events by Ms. Coughlin to be more credible and consistent. An example of this relates to the early conversations of Ms. Coughlin and Steven. Ms. J. says these events either never occurred or, at least, that Steven did not tell her.
The court finds to be credible the following scenario. Ms. Coughlin was first able to talk to Steven nearly three months after the child's birth because of her persistent efforts to locate and talk to Steven. The opportunity occurred when Ms. Coughlin visited him in the Connecticut correctional facility. He acknowledged that he knew of the birth of the child. He knew that the agency was trying to talk to him. He said he was too busy with other matters. He did not ask about the child's well-being. He did not ask for a picture. He was offered a visit with the child, to which he replied that he would think about it. He was offered an opportunity to meet the people who were caring for the child; he declined. Steven, who was likely to be in jail for a year at that point, said to the worker that he wanted the baby for his mother. He told her "[I]f I'm old enough to do the man thing. I'm old enough to keep the baby." Ms. Coughlin said she asked him to think about the things they had talked about, but he never called her back or wrote to her. He never personally contacted the worker again to inquire about the health or welfare of the child.
Lydia Polanco, a DCF social worker testified that the social history as reported by Steven was a great variance with information in DCF records regarding the Ms. J. and her son, Steven. Ms. Polanco stated that "Steven described his childhood overall as good because he was treated 'very well' by his mother. CT Page 7690 He describes himself as a child as 'really spoiled' mostly because he was an only child." (Petitioner's Exhibit # 4).
Steven's DCF file indicates he first came to the attention of DCF (then known as the Department of Children and Youth Services) when Steven, a/k/a Angel R., was three years old on a report of sexual abuse by a neighbor. While a therapist repeatedly asked Ms. J. to bring the child for counseling, she was reluctant to do so. DCF thereafter closed its file.
When Steven was five, DCF received reports of alleged abuse by Steven s mother. Steven was out of control, he was playing with matches, fire setting, stealing, leaving school, and was unable to be controlled in day care. "She (Ms. J.) Reported being afraid she may hurt him and sometimes she feels like 'keeping on hitting him"'.(Exhibit #4, p. 6.)
On January 28, 1983, the Child Guidance Clinic reported to DCF that Angel had disclosed that his hands had been burned to stop him from setting fires. Ms. J. admitted to DCF that she and her boyfriend had lit a sack on fire and stuck Angel's hands in the bag just to show him how it would feel if he got burned.
In 1985, Steven (Angel) was again involved with DCF due to his out of control behavior. A DCF report stated:
 Angel was seen by Richard Miller, Ph.D. of the Institute of Living. He concluded that Angel (A.K.A. Steven) is an 8 year old boy who spent his life in a chaotic environment characterized by episodes of physical abuse, sexual abuse and neglect. Dr. Miller characterized Ms. J. as being continually unable to provide consistency, structure, and nurturance required by Angel. . . . Dr. Miller states that Angel suffers from depression, severe aggressive and impulsive behavior, vandalism, truancy, deteriorating functioning at school, night time enuresis, encopresis, as well as severe impairment of social and peer interactions. Dr. Miller's diagnostic impression was: conduct disorder, under-socialized aggressive; dysthymic disorder; enuresis and encopresis. Dr. Miller recommended immediate residential placement for Angel, as he felt Angel presented a significant risk to himself and others. . . . On 8-1-85, Angel was placed in the Cromwell Children's Home on a voluntary permission to place; . . . it is anticipated that his placement will be needed for at least one full year. CT Page 7691
The report further indicates that while Steven was at the Cromwell Children's Home it was learned that at age ten. Steven fondled the genitals of a five year old female, and he had sex with a twelve year old. At that same age he was abusing alcohol and marijuana, according to the DCF records. Steven has two convictions of sexual assault for having sex with a thirteen year old in 1993 and for his sexual conduct with Erin which resulted in a conviction in 1996.[5] He has arrests and convictions in Connecticut and New Jersey for sexual assault, larceny in the 6th degree and 3rd degree, assault, and violation of probation.
On the Wednesday, June 3, 1998, six days before this trial commenced, Steven was again arrested and incarcerated on a warrant charging him with violation of probation. Steven was bonded out of jail and attended this trial. Elaine Byrnes, Steven's probation officer testified that he was violated for unsuccessfully completing his sexual offender counseling (failure to comply with treatment). He has three years of incarceration facing him if he is found to be in violation of his present probation. He is also on probation in New Jersey.
It is clear to the court that the real party in interest is not Steven, who is neither interested nor likely to be able to parent this child, but rather his mother, Ms. J., whose record as a parent of Steven is deeply scarred. She sincerely wants this child. Her rights, however, are not superior to those of her son. Based upon her lack of good faith in dealing with LSS both with respect to his location and to his social history, her own history as a parental failure, and her character as observed by the court, even if Steven's parental rights were not terminated, it would be highly unlikely that she would be considered an appropriate placement resource. When questioned by the court, Ms. J. had no recognition that her son was a deeply troubled individual.
III. Law: Rights of Unwed Fathers.
With respect to the fact that the respondent Steven J. is the male biological parent of the child, albeit unmarried, this court is mindful of the parental rights of a person based on the mere fact of reproduction which give rise to constitutionally protected rights. See, e. g., Roe v. Wade, 410 U.S. 113, 152-153
(1973); Wisconsin v. Yoder, 406 U.S. 205, 231-233 (1972); Stanleyv. Illinois, 405 U.S. 645, 651 (1972); Ginsberg v. New York, CT Page 7692390 U.S. 629, 639 (1968); Griswold v. Connecticut, 381 U.S. 479
(1965); id., at 495-496 (Goldberg, J., concurring); id., at 502-503 (White, J., concurring); Poe v. Ullman, 367 U.S. 497,542-544, 549-553 (1961) (Harlan, J., dissenting); cf. Loving v.Virginia, 388 U.S. 1, 12 (1967); May v. Anderson, 345 U.S. 528,533 (1953); Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535,541 (1942).
There are six cases of the United States Supreme Court that are instructive regarding the rights of unwed fathers: Stanley v.Illinois, 405 U.S. 645 (1972), Quilloin v. Walcott, 434 U.S. 246
(1978), Caban v. Mohammed, 441 U.S. 380 (1979), Lehr v. Robinson463 U.S. 248 (1983), Rivera v. Minnich, 483 U.S. 574 (1987), andMichael H. v. Gerald D., 491 U.S. 110 (1989). In Lehr v.Robinson, the court stated a common theme: "When an unwed father demonstrates a full commitment to the responsibilities of parenthood by com[ing] forward to participate in the rearing of the child, his interest in personal contact with his child acquires substantial protection under the due process clause."
Justice Potter Steward, writing in dissent, in the earlier case of Caban v. Mohammed, supra at 397, in language later approved by the Supreme Court in Lehr, observed:
 The Constitution does not require that an unmarried father's substantive parental rights must always be coextensive with those afforded to the fathers of legitimate children. Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring. The mother carries and bears the child, and in this sense her parental relationship is clear. The validity of the father's parental claims must be gauged by other measures. By tradition, the primary measure has been the legitimate familial relationship he creates with the child by marriage with the mother. By definition, the question before us can arise only when no such marriage has taken place. In some circumstances the actual relationship between father and child may suffice to create in the unwed father parental interests comparable to those of the married father. Cf. Stanley v. Illinois, 405 U.S. 645. But here we are concerned with the rights the unwed father may have when his wishes and those of the mother are in conflict, and the child's best interests are served by a resolution in favor of the mother. It seems to me that the absence of a legal tie with the mother may in such circumstances appropriately place a limit on whatever CT Page 7693 substantive constitutional claims might otherwise exist by virtue of the father's actual relationship with the children.
While the results in the six Supreme Court cases varied for and against the various petitioners, the key feature of each successful petitioner involved the cases in which the unwed father immediately asserted his paternity and manifested a significant paternal interest in a timely fashion. Those fathers who coupled their biological connection to the child with commonly accepted notions of parental responsibility were found to be entitled to due process protection; the late comers were not entitled to the full panoply of constitutional protections. See also: Pena v. Mattox, 84 F.3d 894 (7th Cir. 1996) where the court observed that "biology and association can together establish a relationship between the father and child that may be essential to the happiness of both, even if the formality of marriage is missing." The court further found that biology must be cemented by association in order to perfect the constitutional protection.
This concept of biology plus parental responsibility promptly asserted has been accepted in other states. In Michael H. v. MarkK., 898 P.2d 891, 896 (Cal. 1995) an unwed biological father tried to block an adoption of his illegitimate child. The California Supreme Court held that federal Constitutional protection does not attach for purposes of preventing an adoption, unless the natural father can prove "that he has promptly come forward and demonstrated his full commitment to his parental responsibilities," saying, "the federal Constitution protects only the parental relationship that the unwed father has actively developed" (citing Lehr v. Roberson, supra, at 261).
In dealing with infant children, a critical element in evaluating the father's interest is the timing of his actions and his good faith actions with respect to the child. In Robert O. v.Russell K., 80 N.Y.2d 37, 604 N.E.2d 99 (1992), the New York Court of Appeals dealt with an issue of paternal notification and the timeliness in a father's asserting of his parental rights. The appellate court held:
 States' determination of the rights of unwed fathers need not be blind to the "vital importance" of adoption procedures possessed of "promptness and finality" promoting the best interest of the child. . . . Promptness is measured in terms of the baby's life, not by the onset of the father's CT Page 7694 awareness. The demand for prompt action by the father at the child's birth is neither arbitrary nor punitive, but instead a logical and necessary outgrowth of the child's need for the early permanence and stability.
Sociological studies and literature dealing with infants and bonding reflect the need for prompt action by any person seeking to act in the parental role, married or unmarried. Usually, this biological connection acts as a "powerful motivating force for most parents to provide their children with continuous affectionate and responsible care. But we recognize that a child's attachments and healthy development do not rest on biology alone. They ultimately depend on the adult caretaker's reciprocal affection in day-to-day care and attention to the child's needs" Goldstein, Freud, and Solnit, Before the BestInterests of the Child, The Free Press (1979) p. 133-134.
It is beyond peradventure to say that the need for both immediate child-care and prompt decision-making is of greatest urgency when it comes to the issue of newborn infants. In Robin Karr-Morse and Meredith Wiley's seminal work Ghosts from theNursery: Tracing the Roots of Violence, The Atlantic Monthly Press, New York (1997) p. 4, the authors compellingly demonstrate the need for a secure, safe and stimulating environment, not only during infancy but during the period of gestation as well. "Prenatal development and the first two years are the time when the genetic, organic and neurochemical foundations for impulse control are being created. It is also the time when the capacities for rational thinking and sensitivity to other people are being rooted — or not — in a child's personality . . . . This overlooked chapter of early growth sees the building of the capacities for focused thinking and for empathy — or the lack of these."
This need for immediate care and prompt decision making "comports . . . with each child's biological and psychological need for unthreatened and unbroken continuity of care. . . . No other animal is for so long a time after birth in so helpless a state that its survival depends upon continuous nurture by an adult." (Footnotes omitted.) Goldstein, Medical Care for theChild at Risk: On State Supervision of Parental Autonomy, 86 Yale L.J. 645, 649 (1977) cited in In Re Juvenile Appeal, (83-CD),189 Conn. 276, 286 n. 11 (1983).
The United States Supreme Court, in striking down a New York CT Page 7695 statute which drew an impermissible distinction between the rights of unwed fathers and other parents, implicitly acknowledged that newborn infants may require special treatment. "[E]ven if the special difficulties attendant upon locating and identifying unwed fathers at birth would justify a legislative distinction between mothers and father of newborns, these difficulties need not persist past infancy. Caban v Mohamed, supra at 392.
Based upon the foregoing analysis of cases, it appears fair to conclude that a father, especially an unwed father, is required to act expeditiously and in good faith to perfect his paternal rights. This is not to say that mere biology, without being bonded by marriage or association, does not require some protection. But the efforts of a social service agency to reunify the parent and the child must be judged against the nature of the relationship between parents themselves, and the parent and the child, the nature and the circumstances surrounding the childs' situation, and, in the words of the statute, "considering the age and needs of the child."
Here the relationship with the male biological parent is non-existent. The child was conceived under circumstances which are considered unacceptable, indeed, criminal. There is no formal relationship of marriage to the child's mother. There is no love between the parents. The male biological parent and the child's mother differ drastically on a plan for the child's care. The male biological parent and his mother have misled the social service agency as to the location and circumstances of the father. There was no direct contact by male biological parent with the child or the agency for several months even though the respondent was well aware of the child's birth. The child was a newborn infant. The child's mother had developed an appropriate and desirable plan for the child to be raised by a bonded pair of adults who zealously sought to parent the child.
This court finds that the age and needs of this child at birth required prompt and decisive action on the part of those wishing to act in a parental role. The respondent did not act promptly and did not act in good faith. Steven had not been adjudicated the father, he had not acknowledged in writing to be the father, he made no claim under General Statutes § 64b-172a to register his claim, he made no effort to express concern for the child's well being, he made no effort to establish a relationship with the child by seeking visitation CT Page 7696 or otherwise.
III. Adjudication
Abandonment
The child Courtney, has been abandoned by the male biological parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. General Statutes § 17a-112
(c)(3)(A); [probate] General Statutes § 45a-717(g)(2)(A). In addition to the oft expressed statements of law as set forth below, this court holds that with respect to new-born infant children, the needs of an infant requires especially prompt and decisive action on the part of those wishing to act in a parental role.
It is understandable that an unwed man confronted with the possibility of paternity may waffle and equivocate about his role in the conception. He may be very troubled by the prospects of long-term support payments for a child that may never live with him. He may be personally unprepared or unable to raise such a child. But in the case of an infant whose young, unmarried mother feels that adoption is an appropriate parenting plan for the child, the putative father must act promptly and decisively in good faith to secure his parental rights.
This court finds that Steven's conduct was neither prompt nor in good faith. Abandonment focuses on the parent's conduct. In reMichael M., 29 Conn. App. 112. 614 A.2d 832 (1992); In re RaynaM., 13 Conn. App. 23. 36, 534 A.2d 897 (1987); In re Kezia M.,33 Conn. App. 12, 632 A.2d 1122 (1993)." Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." In re JuvenileAppeal (Docket No. 9489) 183 Conn. 11, 14, 438 A.2d 801 (1981). "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of 'interest, concern or responsibility' for the welfare of a child." In re Luke G., 40 Conn. Sup. 316, 323, 498 A.2d 1054
(1985); In re Migdalia M., 6 Conn. App. 194, 208-209,504 A.2d 532 (1986).
Steven's imprisonment does not complicate the issue. The incarceration of a parent does not alone constitute abandonment. CT Page 7697In re Juvenile Appeal (Docket No. 10155), 187 Conn. 431, 443,446 A.2d 808 (1982); In re Juvenile Appeal (84-6) 2 Conn. App. 705,711, 483 A.2d 1101 (1984) cert. denied, 195 Conn. 801,487 A.2d 564 (1985). The restrictions on movement that are inherent to incarceration, however, do not excuse a failure to make use of available, albeit limited, resources for communication with one's children." In re Juvenile Appeal (Docket No. 10155), supra;In Re Shannon S., 41 Conn. Sup. 145, 153, 562 A.2d 79 (1989). Steven had the ability to at least communicate with persons responsible for the child's care and safety. He did not. His only manifestation of interest, which occurred after he was tracked down by the LSS worker, was that he wanted to give the child to his mother, as if the child were a chattel. He did not wish visitation. He did not inquire as to the child's well-being.
Some of the obligations of parenthood can be pursued, even from prison. "The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child;. . . . and (5) the duty to furnish social and religious guidance." In reJuvenile Appeal (Docket 9489), 183 Conn. 11, 15, 438 A.2d 801
(1981) (quoting In re Adoption of Webb, 14 Wash. App. 651, 657,544 P.2d 130 (1975)). This court finds that the male biological parent took no action to maintain a relationship with his child; he did not visit her; he did not communicate with her; he did not provide guidance; he did not express concern. The child has no relationship with him, nor he with her. He has, by his conduct, effectively abandoned the child within the contemplation of General Statutes § 17a-112 (c)(3)(A).
No On-going Relationship
This court further finds by clear and convincing evidence that the male biological parent has no ongoing parent child relationship with Courtney. This means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child (General Statutes § 45a-717(g)(2)(C)).
It should be noted that Steven's is not a situation where the CT Page 7698 child was removed from the parents by force of state action. His own conduct or lack of affirmative conduct has precluded any relationship with the child. "The question is whether they [the facts] substantiate a finding by clear and convincing evidence that no relationship ever existed between the parent and child, or that the relationship has terminated, without any future hope for its establishment or reestablishment." (Internal brackets mine.) In re Migdalia M., 6 Conn. App. 194, 211, 504 A.2d 532
(1986); In re Juvenile Appeal (84-3), 1 Conn. App. 463,473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984); In reJuvenile Appeal (Anonymous), 177 Conn. 648, 670-671, 420 A.2d 875
(1979). "It is reasonable to read the language of 'no on-going parent-child relationship to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been displaced. In either case, the ultimate question is whether the child has no present memories or feelings for the parent." In re Juvenile Appeal (Anonymous),177 Conn. 648, 670, 420 A.2d 875 (1979). See also In re JuvenileAppeal (Anonymous), 181 Conn. 638, 646, 436 A.2d 290 (1980). Here no relationship ever developed. The state and federal law are clear that with respect to unwed fathers, the key to accruing constitutionally protected rights is association with the child. Here, Steven did nothing to promote association with the child, not even the most fundamental or basic overture toward communication. There is not now, nor has there ever been any on-going parental relationship. The evidence is that the child is now secure, safe and psychologically bonded to two pair-bonded persons who wish to adopt the child. Steven, who has been physically, emotionally, spiritually, and financially unavailable to this child, is presently facing further incarceration in the future. His own personal emotional needs are still unmet. To allow further time to expire to wait for Steven's personal rehabilitation would not be in the child's best interest.
IV. Time Period.The statutory requirement of one year for the grounds to exist may be waived pursuant to General Statute §45a-717(h). Here the court finds that from the totality of circumstances, especially considering the proposed adoption of the child, a waiver is necessary to promote the best interest of the child.
V. Mandatory Findings General Statutes § 45a-717(I)
CT Page 7699
The child's mother has filed a consent to terminate her parental rights. No findings are required as to the mother.
(1) The facts have been fully developed earlier. They support the finding that the child placing agency made timely efforts to locate the male biological parent and to offer planning services to him. Through a combination of lack of interest and bad faith in dealing with the agency, the agency was unable to offer reunification efforts.
(2) There were no applicable court orders entered except an invitation by the probate court judge to have the respondent sign an acknowledgment of paternity. He declined to do so.
(3) The child has never met the respondent and could not have any positive emotional bonds or feelings toward him. The child is bonded to his preadoptive parents.
(4) The child is now two and a half years of age and has been with the pre-adoptive parents since birth.
(5) The court has considered the efforts or lack of efforts by the male biological parent which is fully explored infra. It would serve no useful effort to repeat those finding here.
(6) The court notes only unreasonable conduct on the part of the male biological parent and his mother in keeping the respondent's whereabouts unknown. The respondent was located only through the persistent efforts of Ms. Coughlin.
VI. Disposition
Based upon the foregoing findings and upon the testimony and evidence presented, the court finds that it would be in the child's best interest to terminate the parental rights of Erin, by her consent, and of Steven J. at this time. This finding is made after considering the child's sense of time, her need for a secure and permanent environment, the relationship that the child has with the pre-adoptive parents, and the totality of circumstances that the termination of parental rights is in the child's best interest. In re Juvenile Appeal (Anonymous), supra,177 Conn. at 667-68. See generally, J. Goldstein, A. Freud A. Solnit, Beyond the Best Interests of the Child 99 (1979); Karr-Morse and Wiley Ghosts from the Nursery, The Atlantic MonthlyPress, New York (1997). CT Page 7700
VII. Order
Based upon the foregoing findings, IT IS ORDERED that the parental rights of Erin H. and Steven J. are hereby terminated. The Lutheran Social Services of New England, Inc., 2139 Silas dean Highway, Rocky Hill, CT is hereby appointed the statutory parent for the purpose of assisting in the adoption of Courtney. The social service agency shall file such reports and documents as are required by the state law and the Adoption and Safe Families Act of 1997.
Judgment may enter accordingly.
 Francis J Foley, III Judge of the Superior Court
[2] Only for the sake of convenience is the male biological parent called "father".
[3] As a result of the sexual intercourse with a 14 year old minor female, Steven was convicted of Sexual Assault in the second degree in violation of General statutes § 53a-71 on September 25, 1996. While the legislature has since added sexual assault as a ground for termination of parental rights (Public Act 98-241 effective July 1, 1998), this new law exempts numerous categories of people, including Steven, and therefore the court may not terminate their parental rights under this new statute. The following classes of sexual assaults are exempted: (1) the mother is thirteen years of age or older but under sixteen years of age and the actor is more than two years older than such person (as in this case); or (2) the mother is mentally defective or mentally incapacitated to the extent that she is unable to consent to such sexual intercourse; or (3) the mother is physically helpless; or (4) the mother is less than eighteen years old and the actor is such person's guardian or otherwise responsible for the general supervision of such person's welfare; or (5) the mother is in custody of law or detained in a hospital or other institution and the actor has supervisory or disciplinary authority over such other person; or (6) the actor is a psychotherapist and the mother is (A) a patient of the actor and the sexual intercourse occurs during the psychotherapy session, (B) a patient or former patient of the actor and such patient or former patient is emotionally dependent upon the actor, or (C) a patient or former patient of the actor and the CT Page 7701 sexual intercourse occurs by means of therapeutic deception; or (7) the actor accomplishes the sexual intercourse by means of false representation that the sexual intercourse is for a bona fide medical purpose by a health care professional; or (8) the actor is a school employee and the mother is a student enrolled in a school in which the actor works or a school under the jurisdiction of the local or regional board of education which employs the actor.
[4] An acronym for Acquired Immune Deficiency Syndrome.
[5] Steven is required to register as a sexual offender with the chief of police or resident state trooper in any municipality in which he resides pursuant to General Statutes § 54-102(r)