Memorandum of Decision
On December 13. 1997, the Department of Children and Families (DCF) filed petitions to terminate the parental rights of Rasheena M. and Frank B. to their daughters Shantrise B., Kimberly M., and Tiombe M. A consolidated trial of the termination petitions took place on September 28 and 29, 1998. During the trial, the mother consented to the termination of her parental rights to all three children. The trial went to conclusion to determine the father's parental rights. For the reasons stated below, the Court grants the petitions terminating parental rights to all three children.
FACTS
The Court finds the following facts and credits the following evidence.
A. The Children
Shantrise B. was born on October 2, 1991 and was almost seven years old at the time of trial. Kimberly M. was born on March 30, 1994 and was about four and one-half at the time of trial.
On March 1, 1996, the New Britain police executed a search and seizure warrant at the respondent mother's residence and arrested the mother for possession of narcotics and possession of drug paraphernalia. The mother admitted that she had been using crack cocaine for the prior three years. The police found the residence in deplorable condition, with broken furniture and no food. On March 5, 1996, DCF filed a petition alleging that Shantrise and Kimberly were neglected.
The mother was eight months pregnant at the time of the police raid. On April 11, 1996, the mother gave birth to her third daughter, Tiombe. At the time of her delivery, the mother tested positive for cocaine and admitted using drugs and alcohol frequently during her pregnancy. Four days later, DCF filed a neglect petition on behalf of Tiombe and obtained an order for CT Page 11533 her temporary custody.
On May 5, 1996, DCF obtained an Order of Temporary Custody for Shantrise and Kimberly. DCF placed Shantrise and Kimberly in one foster home and Tiombe in another. On September 25, 1996, the Court adjudicated all three children to be neglected and committed them to DCF for one year. DCF subsequently obtained two extensions of the commitment, which will expire September 25, 1999.
Fortunately, Shantrise and Kimberly experienced normal developmental histories and had no unusual medical problems. Shantrise is now doing well in elementary school. She is a parentified child who feels it necessary to care for her younger sibling. Shantrise is very bonded to her foster mother but also has some bonds with her biological mother. Kimberly similarly has bonded with her foster mother but does not have the same bond with her biological mother.
Shantrise and Kimberly have interacted with their father during visits, with Kimberly following Shantrise's lead. Although Shantrise remembers her father from her early years, Kimberly does not have the same memories and neither girl now has any especially positive feelings about their father. The foster mother, who has a total of five foster children in her home, has provided Shantrise and Kimberly a wonderful environment, full of both affection and guidance.
Tiombe had eczema during her first year of life, but now is a healthy, happy two and one-half year old girl. Tiombe also has the good fortune of a foster mother who takes excellent care of her foster daughter. Tiombe has bonded with her foster mother, who is the only mother that Tiombe has known. Tiombe was very reserved during visits with her biological mother and did not interact with her biological father. Tiombe has no positive memories of or feelings for her natural parents.
B. The Father
At the time of trial, the father, Frank B., was twenty-seven years old. Largely due to DCF's failure to investigate the matter, the Court knows little about the father's background.[2] The father was convicted of first degree failure to appear in court in May, 1991, stemming from a 1989 arrest by the Hartford Police Department for felony CT Page 11534 larceny. It is not clear how long the father lived with the mother from 1991 to 1995, during which time all three children were conceived, although it is clear that the parents were never married. In 1994, the father apparently was on parole in New York but returned to Connecticut. In late October, 1994, about seven months after Kimberly's birth, the father went to prison for violation of parole and remained incarcerated until March, 1995. The father was arrested again in early March, 1996 for possession and sale of narcotics and was detained in jail until May, 1996, during which time period Tiombe was born.
In late May, 1996, the father appeared, without invitation, at a drug treatment center where DCF had arranged a visit for the mother and the children. The father also attended a visit with the mother and children at a park on June 7, 1996. At these visits, a DCF social worker told the father that she would arrange visits, expectations, and services if he would contact her. The father at that time denied paternity, at least as to Kimberly and Tiombe. The father also expressed the view that the children should be placed with the mother.
The father did not contact the DCF worker. He did not pay child support during this period. On or about July 29, 1996, the father filed a motion in the neglect case for a paternity test as to all three children. In August, 1996, the father's whereabouts became unknown to DCF. The father failed to appear at the neglect petition hearing on September 25, 1996, and therefore the Court did not set any expectations for him. On October 30, 1996, police arrested the father for failure to appear in court on the underlying drug charges. The father was eventually convicted on felony drug charges and remained incarcerated until February 3, 1998.
The father, while incarcerated, attended court hearings in July and August, 1997, but did not ask the Court to set expectations. On or about September 22, 1997, DCF received the results of the paternity tests. which established Frank B. as the father of all three children. There was then an unexplained delay of about two months until DCF disclosed the results of these tests to all counsel in a social study filed with the termination petition. During the entire time the father was in prison, including the time after the disclosure of the paternity test results, the father did not request any assistance from DCF in contacting his children. CT Page 11535
Upon the father's release from prison, DCF arranged a visit with his children for February 20, 1998. The father failed to attend. He did not contact DCF until May 11, 1998, when he informed DCF and the Court that he had not visited because he needed to work to pay a $6,500 fine or restitution debt. On May 20, 1998, the father had his first visit with his children in over two years. After another missed visit in June. 1998, the father visited the children twice in July, failed to contact DCF in August, 1998, and then visited the children once in September.
ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. sec. 17a-112(c)(1).[3] "Reasonable efforts means doing everything reasonable, not everything possible." In re Jessica B., 50 Conn. App. 554, 566 (1998)
While DCF clearly did not do everything possible to locate and reunify the father with his children, they did do everything reasonable. On two occasions in the late spring of 1996, a DCF social worker encountered the father at scheduled visits with the mother and offered to arrange visits, expectations, and services for the father if he would call her at the office. Although in some cases such a "you call us" policy might prove insufficient, in this case it does not. The father had just been released from a short stay in jail and two months later disappeared again. It is not unreasonable under these circumstances for DCF to shift the burden to the parent to contact them. As a parent, in fact, the father had a moral obligation to contact and support his children, regardless of DCF's initiatives. See Inre Juvenile Appeal (Docket No. 9489), 183 Conn. 11, 15 (1981).
Further, the father had denied paternity of at least two of the children, filed a motion to determine paternity as to all three, and indicated that he thought the children should be placed with the mother. Despite these denials, the father might have been entitled to Court-ordered expectations and DCF services if he had only appeared for the commitment hearing in September, 1996. He did not. Indeed, at about the same time a rearrest CT Page 11536 warrant issued from the criminal court due to his failure to appear there. When the father did appear in court in July and August, 1997, he did not request expectations or reunification. Given these facts, DCF's efforts to locate and reunify the father with the children were reasonable. See In re DrewR., 47 Conn. App. 124, 130-131 (1997).
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael B., 49 Conn. App. 510, 512 (1998). General Statutes sec. 17a-112(c)(3) requires that, with one exception not pertinent here, these grounds must have existed for at least one year unless the Court waives the one year requirement based on the standards set forth in sec. 17a-112(d).[4] In this adjudicatory phase the Court is limited to events preceding the filing of the petition or the latest amendment. See Practice Book sec. 33-3(a). Because DCF in this case filed a motion to amend the petition on August 25, 1998, that date becomes the adjudicatory date.
DCF has alleged the grounds of abandonment and failure to rehabilitate with regard to all three children and lack of an on-going parent-child relationship with regard to Shantrise and Kimberly. DCF alleges that these grounds have existed for more than one year. The Court finds that DCF has proven its allegations.
1. Abandonment
General Statutes sec. 17a-112(c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of the child." In re Migdalia M..,6 Conn. App. 194, 208-209, cert. denied, 199 Conn. 809
(1986). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id. at 209. The CT Page 11537 statutory term "maintain" implies a "continuing, reasonable degree of concern." Id. at 210.
In this case, the father visited his three children on only two occasions between May, 1996, and May, 1998. After May, 1998, the father visited only sporadically. It appears that the father has only seen Tiombe about six times in her entire life. The father also did not contribute to the children's support. While for much of this time period the father was in prison, incarceration is not a complete defense to abandonment. See In reJuvenile Appeal (Docket No. 10155), 187 Conn. 431, 443 (1982). The father never attempted to arrange visitation through the prison system or DCF and never attempted to communicate with the children through cards, letters, or gifts.
Although the father denied paternity of Kimberly and Tiombe during this period, and did not formally acknowledge paternity of Shantrise, these facts also do not excuse the father's failure to maintain a reasonable degree of concern. The father could not have been shocked to learn the results of the paternity test, since it is obvious that he had sexual relations with the mother on at least three occasions between 1991 and 1995. A father's obligation to maintain contact with his children is not suspended during the pendency of a paternity test, especially when, as here, the father has a strong reason to believe that he is in fact the father. In this case, instead, the father took the position that DCF should return the children to the mother. Given these facts, the Court finds that DCF has proven abandonment.
2. Failure to Rehabilitate
A second statutory ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes sec. 17a-112(c)(3)(C). No dispute exists that the Court has previously found all three children to have been neglected, thus satisfying a statutory prerequisite. The remainder of the statute requires the Court to analyze the parents' rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable `within a reasonable time.'" In re Luis C., 210 Conn. 157, 167 (1989). The statute, CT Page 11538 however, does not require parents "to be able to assume full responsibility for a child, without the use of available support programs." In re Jessica M., 49 Conn. App. 229, 240 (1998) (internal citation omitted).
It is true that, at the time of the neglect finding in this case, the Court did not set expectations and DCF did not offer any services. The explanation for this fact, of course, is that the father failed to appear in court. The father did appear in Court in July and August, 1997, but did not request that the Court set any expectations. Thus prior to the filing of the termination petition, the father did not show any interest in meeting the Court s standards for rehabilitating himself as a parent.
Shortly after the finding of neglect in this case, the father went to prison for sale of narcotics. The sale of narcotics is destructive of the community, because it results in the distribution of substances that cause other people to become addicted and then to commit other crimes to support their addiction. Further, the lesson that the father teaches his children by selling drugs — that you do not have to support yourself by earning an honest living — is precisely the wrong one. Once in prison, the father apparently did nothing, such as substance abuse treatment and education, to rehabilitate himself from his criminal behavior.
Upon his release from prison, the father missed a visit with his children and failed to contact DCF. While the father claimed that he had to work off a fine or restitution debt during this time period, the difficulty he found himself in is one of his own making and, in any event, does not excuse a complete failure to contact DCF. Even after the May 20, 1998, visit, which was his first in over two years, the father's visits with the children were at best sporadic. Based on all these facts, DCF has proven that the father has failed to rehabilitate himself.
3. No On-Going Relationship
The third statutory ground alleged in this case with regard to Shantrise and Kimberly is that there is "no on-going parent-child relationship, which means the relationship that develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or CT Page 11539 reestablishment of such parent-child relationship would be detrimental to the best interest of the child." General Statutes sec. 17a-112(c)(3)(D). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced." In reJuvenile Appeal (Anonymous), 181 Conn. 638, 645 (1980) (internal citation omitted). "In either case the ultimate question is whether the child has no present memories or feelings for the natural parent." Id. at 646.
In this case, Shantrise apparently did have a relationship with her father during her early years and does have some present memories of him. Because, however, she has seen her father so infrequently over the last few years, and has developed a bond with her foster family, she has lost the relationship with her father "so that despite its former existence it has now been completely displaced." In re Juvenile Appeal (Anonymous), supra.
Kimberly has neither memories not positive feelings towards her natural father. Accordingly, the Court finds that the father has no on-going relation with either child.
4. One Year Requirement
The Court finds that the conditions supporting the termination of parental rights to the children existed for more than one year prior to filing of the petition. Moreover, the Court can waive the one year requirement if it finds that "[f]rom the totality of the circumstances surrounding the child that such a waiver is necessary to promote the best interest of the child." General Statutes sec. 17a-112(d)(1). Based on the discussion that follows of the best interests of the child, the Court waives the one year requirement to the extent necessary to sustain this decision.
DISPOSITION
In the dispositional phase of a termination case, the Court must consider whether the DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." General Statutes sec. 17a-112(c)(2). The Court can consider all events occurring through the close of the dispositional hearing. Practice Book sec. 33-5. In arriving at a decision, the Court must consider and make written findings regarding seven factors CT Page 11540 set out in General Statutes sec. 17a-112(e). See In re TabithaP., 39 Conn. App. 353, 362 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the Court finds that DCF offered visitation and appropriate social services in a timely manner but that, other than sporadic visitation, the father failed to take advantage of these offers.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
As stated above, the efforts of DCF to reunify the father with his children were reasonable given the father's disinterest.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent and the extent to which all parties have fulfilled their obligations under such order.
As stated, the Court did not enter expectations for the father because he either did not appear in court or, when he appeared. did not show an interest in court-ordered expectations.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
As stated above, the children are bonded to their foster families and are not bonded to their father.
5) The age of the child.
As stated above, Shantrise is almost seven, Kimberly is four and one-half, and Tiombe is two and one-half years old. These children have lived over two years of their short lives in foster care. Our Supreme Court has long recognized the deleterious effect of prolonged temporary care of abused and neglected CT Page 11541 children. See In re Juvenile Appeal (83-CD), 189 Conn. 276, 292
(1983). The Appellate Court has also observed that "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence in custody cases." In reAlexander V., 25 Conn. App. 741, 748 (1992). Thus it is not in the best interests of the children to keep them in temporary foster care settings for the purpose of giving the father more time to rehabilitate himself. Further, given that the mother has consented to termination, the father would have to rehabilitate himself to the point where he could provide the appropriate support and guidance to the children without the presence of the natural mother. The Court is not willing to put the children on hold for however long those rehabilitative efforts would take.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interests of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the Court finds that the father has not been successful in the limited efforts he has made to adjust his circumstances or conditions to facilitate reunification and has not maintained regular contact with his children.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person. or by economic circumstances of the parent.
The only evidence on this point is the fact that the father had some conflicts in 1998 between his efforts to earn money to pay a financial penalty to the Court and at least one DCF scheduled visit with his children. While it is encouraging to see the defendant attempting to pay back society, his conflict was a consequence of his own actions. The father, moreover, did not maintain contact with DCF in an attempt to work out a more convenient schedule. CT Page 11542
CONCLUSION
Based upon the foregoing findings, the Court determines that it is in the best interest of Shantrise B., Kimberly M., and Tiombe M., for a termination of parental rights to enter with respect to their mother, Rasheena M.. and the father, Frank B. Accordingly, the Court hereby terminates their parental rights. The Court further orders that the Commissioner of DCF is appointed statutory parent for these children for the purpose of securing an adoptive family. If the foster parents are willing to adopt, it is the Court's direction that they receive first consideration. The Commissioner shall file with this Court no later than ninety days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
It is so ordered.
Carl, J. Schuman Judge, Superior Court