MEMORANDUM OF DECISION
On October 22, 1999, the Department of Children and Families ("DCF" or petitioner) filed a petition to terminate the parental rights of Lorie D., also known as Lorie P., mother, and Kevin K., father, to their child, Farrah P. Trial concerning the petition was held on May 30 and 31, 2000 and June 1, 2000. Seven witnesses testified and twenty-one exhibits were admitted into evidence. For the reasons stated below, the court grants the petition.
FACTS
The court finds the following facts and credits the following evidence, except as noted.
A. Background of the Case
CT Page 6887
Farrah was born on August 28, 1996. On May 22, 1997, a petition was filed by DCF in the Superior Court for Juvenile Matters alleging that Farrah was being denied proper care and attention physically, educationally or morally and that she was permitted to live under conditions, circumstances or associations injurious to her well-being. Lorie D. and Kevin K. were named as respondents, as mother and father of Farrah. Presenting issues involved a lack of food in Farrah's home and drug usage.
The court issued an order of temporary custody ("OTC") on May 22, 1997. Farrah was placed in foster care, where she has remained until trial. On the same date, the court issued Specific Steps To Facilitate The Children's Return To The Custody Of The Parents. Exh. 2. Lorie D. and Kevin K. were instructed as follows: (1) keep all appointments set by DCF and cooperate with DCF home visits; (2) keep their whereabouts known to DCF and their attorneys; (3) visit the child as often as DCF permits; (4) participate in parenting, individual and family counseling; (5) submit to substance abuse assessment and follow recommendation regarding treatment; (6) successfully complete substance abuse treatment and follow recommendations regarding after-care treatment, including relapse prevention; (7) obtain a restraining order to avoid future violent incidents; (8) accept and cooperate with in-home support services referred by DCF; (9) sign releases authorizing DCF to communicate with service providers; (10) secure and maintain adequate housing and legal income; (11) no substance abuse; (12) no involvement/further involvement with the criminal justice system; and (13) no unauthorized person may live in home.
On September 22, 1997, after a plea of nolo contendere by Lorie D., Farrah was adjudicated as a neglected child and her care and custody was committed to DCF for up to twelve months. Since he failed to appear in court on that date, Kevin K. was defaulted. In addition, on that date, the court issued Expectations to Lorie D., which were signed by her and her attorney. Exh. 3. These Expectations were similar to the preliminary Specific Steps issued four months earlier and included: (1) keep all appointments set by or with DCF and keep whereabouts known; (2) visit the child as often as DCF permits; (3) parenting and drug/alcohol counseling, including drug evaluation and follow drug evaluation's recommendation; (4) secure/maintain adequate housing and income; (5) no substance abuse; (6) no involvement with criminal justice system; and (7) mother will not live with anybody without DCF approval. The Expectations included a Notice To Parents, which stated, "Failure to achieve these goals will increase the chance that a petition may be filed to terminate your parental rights permanently so that your child may be placed in adoption." Id. CT Page 6888
On July 8, 1998, effective September 22, 1998, Farrah's commitment was extended for another twelve month period. On the same date, the court ordered paternity testing to ascertain whether Kevin K. was in fact Farrah's father. Kevin K. was present in court and represented by counsel on that date. On October 9, 1998, the court found, as a result of the testing, that Kevin K. was her father.
Thereafter, on December 16, 1998, final Specific Steps were issued by the court as to Kevin K. Exh. 4. These, too, were similar to the preliminary Specific Steps which were issued as to him over one-and-a-half years earlier: (1) keep appointments set by or with DCF; cooperate with DCF home visits; (2) keep his own whereabouts known to DCF; (3) participate in counseling and make progress toward identified treatment goals: parenting skills, individual counseling, and "address past unstable lifestyle and potential issues that lead to his substance abuse"; (4) submit to substance abuse assessment and follow recommendations for treatment; (5) sign releases; (6) secure/maintain adequate housing and legal income; (7) no substance abuse; (8) no further involvement with criminal justice system; and (9) visit the child as often as DCF permits. DCF was ordered to: (1) ensure the child's safety and well-being; (2) provide case management services; (3) develop treatment/permanency plan; (4) refer respondent to appropriate services; (5) monitor the child's welfare; and also, to provide appropriate visitation, beginning two times per month. As with Exh. 3, the Specific Steps contained a warning to Kevin K. that failure to achieve them carried the risk of termination of his parental rights. He signed the Specific Steps. Id.
On September 1, 1999 (signed September 14, 1999), the court ordered the extension of Farrah's commitment until September 22, 2000. In addition, it found, as to Lorie D. and Kevin K., that continuing efforts to reunify Farrah with them were not appropriate.
B. The Mother
Lorie D. was born in New Britain, Connecticut in 1969. While she dropped out of high school in the tenth grade, she subsequently received a G.E.D. diploma. In 1990, she married Joseph D. Two daughters, Brandi and Jasilyn, were born to Lorie D. and Joseph D. Lorie D. separated from her husband in 1994. Divorce proceedings followed. Brandi and Jasilyn live with Joseph D.
In August, 1994, she met Kevin K.; they began living together seven months later and separated in December, 1995, when she began living with Michael L. As noted, Farrah was born on August 28, 1996. CT Page 6889
Lorie D. has never had stable employment. She has admitted to using illegal drugs. She has never completed a substance abuse program. Michael L. had a substance abuse problem when they lived together. She claims to have stopped living with him prior to the end of their romantic relationship in June, 1999. As of trial, she lived with her parents.
Her criminal history reflects eight arrests and five convictions, all since May, 1997. Most recently, as the result of a January 31, 2000 arrest, she was convicted of possession of drug paraphernalia. Previously, she was convicted of credit card theft, failure to appear, interfering with an officer, and assault. She has been incarcerated twice, including after violating probation. Her first arrest, for assaulting a DCF employee, occurred in May, 1997.
C. The Father
Kevin K. was born in 1966. He claims to have been employed as a roofer. At trial, he acknowledged having a substance abuse problem.
On March 6, 1998, he was sentenced to nine months in prison. While there, he expressed an interest in visiting with Farrah. Two visits were held at the prison. He was released in December, 1998 and had two more visits with Farrah, the last being in January, 1999. After she was placed in foster care in May, 1997, these were the only occasions he saw her.
His criminal history includes thirty-one arrests and numerous convictions. At trial, he was incarcerated and anticipated release in January, 2001. His more recent convictions included violation of probation, interfering with an officer, breach of peace, assault, criminal mischief. possession of narcotics and criminal impersonation.
D. Farrah and her Progress in Foster Care
Farrah was almost nine months old when she was removed. When placed in foster care, Farrah was a hyper-active child. She has been in four foster homes. She has bonded with her most recent foster parents, whom she calls "mommy" and "daddy," and with whom she has lived for almost two years. She has overcome initial presenting problems of detachment and lack of attention. When the P.s (her foster family) received Farrah into their care she was unable to articulate well. Now she is on target in language development. Since January, 1999, when Brandi and Jasilyn moved to Massachusetts with Joseph D., Farrah has had no ongoing contact with them. Farrah has thrived in foster care.
The P. family is not able to adopt Farrah, but would like to keep in contact with her. As a possible permanent placement, over the past four CT Page 6890 months, DCF has begun a gradual transition towards placing Farrah with her aunt and uncle, John (Kevin K.'s brother) and Kathy K. They have visited with Farrah, babysat for her, and have had her stay with them on weekends. Farrah is now close to them as well. They would like to adopt Farrah. Farrah is affectionate with Lorie D. and enjoys visits with her. She has no bond with Kevin K.
E. Efforts at Reunification and Rehabilitation
1. Visitation
After Farrah was placed, Lorie D. was offered visitation every other week. By September, 1998, only five visits had occurred. Often Lori D. did not call to cancel or reschedule visits. She had a first visit on June 9, 1997, followed by visits on January 5, 1998; February 2, 1998; March 16, 1998; and May 11, 1998.
In August, 1998, Lorie D. was found to have violated terms of her probation, and was sentenced to prison, where she remained until she was released in late January, 1999, when she was placed under transitional supervision. She then lived with her brother and attended a weekly substance abuse program at Catholic Family Services in New Britain. (See discussion below, at 9-10). Visits were provided. DCF suggested having visits bi-weekly; they were provided whenever Lorie D. called to request them. After testing positive for drugs, she was found to be in violation of the terms of her release and was returned to prison in July, 1999. She was released again in October, 1999, just before the filing of the petition.
While in prison, DCF provided Lorie D. with monthly visits with Farrah. In total, after Farrah was placed in May, 1997, through September, 1999, the month before the petition was filed, only 21 visits occurred between Lorie D. and Farrah. Since the filing of the petition, DCF has provided monthly visits.
Four of Lorie D.'s visits with Farrah at the York Correctional Institute were supervised by Ms. Beverly Herbert, a Department of Corrections employee who serves as the liaison between inmate mothers and DCF. Lorie D. also did some volunteer work in her office. Ms. Herbert observed that Farrah and Lorie D. were affectionate with each other and interacted well together. She saw a bond between them. Lorie D. did not have to discipline Farrah at these visits. Farrah seemed happy to see Lorie D. at these visits. When the visiting period would end, Farrah seemed sad and Lorie D. helped with the transition.
As to Kevin K., as noted he has seen Farrah only four times since he CT Page 6891 was placed, twice while he was in jail, on October 14, 1998 and November 4, 1998 and twice after he was released, on December 19, 1998, and the last time on January 13, 1999. At that point he could have visited weekly. Since visits were scheduled during the work day, he asked if he could have weekend visits to avoid interference with his work schedule. DCF could not schedule them on weekends. The DCF social worker assigned to the case, Janusz Wozniacki, told Kevin K. he would work on scheduling visits later in the day.
Then Kevin K. could not be located at the address he provided. Ms. Wozniacki eventually sent a letter to him, dated April 19, 1999, asking whether he had completed an intensive substance abuse program and whether he was still interested in reunification with Farrah. Exh. 10. This letter was returned, stamped "moved — left no address." Kevin K. did not contact DCF seeking additional visits.
Kevin K. has never provided economic support for Farrah. After January, 1999, he did not contact her by telephone, by mail or through DCF. At his last visit, he brought gifts for Farrah.
2. Substance Abuse and Counseling
It is evident to the court that substance abuse is a critical issue for Lorie D. Initially, she avoided being evaluated, although the preliminary Specific Steps required it. After Farrah's removal, DCF repeatedly referred her for a substance abuse evaluation at Community Mental Health Affiliates, Inc. in New Britain. She failed to attend four scheduled appointments. Exh. 7 (letter to Mr. Wozniacki, dated July 8, 1997).
Finally, she was evaluated at the Wheeler Clinic in December, 1997, over six months after Farrah was placed in foster care. Exh. 8 (Substance Abuse/Dependency Evaluation). In this evaluation, on December 18, 1997, Lorie D. admitted using heroin, for two to three months, but claimed to have stopped at the end of the summer. Id. at 2. In contrast, she said that Michael L., with whom she was still living, used drugs three-and-a-half weeks before. Id. The evaluator diagnosed her as a person engaging in "Heroin Abuse." Id. at 4. She stated, "Lorie has a history of experimentation with alcohol, cocaine, and marijuana and has used heroin the most consistently." Id. at 5. Lorie D. professed to believe that neither alcohol nor drugs "have had a negative impact on her life at all." Id. At that time, she was attending the New Britain Alternative Incarceration Center ("AIC"). Id. The evaluator recommended treatment for Lorie D. with Wheeler's Substance Abuse Intervention Group. Id.
The clear need for treatment was underscored again by the test results. Lorie D. tested positive for opiates (morphine) according to the report CT Page 6892 dated December 23, 1997. Exh. 8. (LabCorp report).[2] By letter of the same date, an orientation session with the recommended program was scheduled for Lorie D. on January 7, 1998, two weeks later. Exh. 8. Lorie D. failed to appear for this and two other scheduled appointments. She did not enter the program. As she acknowledged at trial, at this time, when she was attending the AIC, she went downhill.
In March, 1998, another drug evaluation was scheduled for her and, once again, she did not appear. Again, in May, 1998 she was scheduled to have an intake appointment at the Dual Diagnosis Program at New Britain General Hospital for which she appeared late. The appointment was rescheduled for June, 1998, when she failed to appear. She acknowledged using heroin before going to prison. As noted, she went to prison in August, 1998. While in prison, Lorie D. attended NA and AA meetings.
After her release from prison in January, 1999, she began out-patient drug treatment at Catholic Family Services (CFS) in New Britain. This treatment ultimately proved incomplete and unsuccessful as she relapsed and then returned to prison in July, 1999. At CFS she also participated in anger management and domestic violence programs.
Mr. Daniel Flaherty, Lorie's counselor at CFS, testified at trial. He saw her once per week starting in January, 1999. She participated in individual and group counseling. She began to miss sessions in April, May, and June, 1999.
Lorie D. tested positive for morphine twice in June, 1999, the second occurring on June 23, 1999. Exh. 11 (Graham-Massey Analytical Labs, Inc. Report). She admitted using heroin to Mr. Flaherty. He recommended more intensive treatment. He referred her to an intensive out-patient program at Bristol Hospital; they recommended in-patient treatment. Mr. Flaherty did so as well. Lorie D. declined to go in-patient. As Mr. Flaherty noted, she decompensated over the course of her treatment at CFS. While she was stable physically and mentally after coming out of incarceration in early 1999, he watched her deteriorate over the next several months. As noted, she was reincarcerated from July, 1999 to October 19, 1999. She had some one-on-one counseling (three times in three months) during this stay in prison and received a parenting certificate.
At trial, Lorie D. acknowledged that she had not completed a substance abuse program. She had not entered another after her second incarceration. She claims she attends NA/AA meetings. Recently, she signed up for a methadone program.
Although she stated that she did not start using drugs until after the children were removed in May, 1997, she was then living with Michael L. CT Page 6893 Previously, she suspected he was a drug user. Then, he had a seizure in October, 1996, after which she learned he was using drugs. After the children were removed, she used drugs with him. She acknowledged that continuing her relationship with him made it difficult for her to stop using drugs. After all, drug counselors had told her not to associate with people who used drugs. Nevertheless, she continued her relationship with Michael L. until approximately June, 1999, at the same time she relapsed and left the CFS program.
As to Kevin K., he was referred for a substance abuse evaluation at CFS in December, 1998. Exh. 9 at 1 (Substance Abuse Evaluation). To CFS, Kevin K. reported having used cocaine in the past, but not for one-and-a-half to two years. He identified drinking as more of his problem. Id. at 2. Clearly, he lied to the evaluator, since his drug screen "came back positive for cocaine at the highest level indicating that he had used cocaine within a day or two of coming to this interview." Id. Although he had been named in the May, 1997 neglect petition as her father, Kevin K. claimed he had recently discovered he was Farrah's father. Id.[3] Kevin K. also told the evaluator that he estimated he had been arrested "about 10 times." Id. at 3. This, too, was a lie. Exhibit 13, his criminal record, reflects that, as of September, 1997, over one year earlier, he had been arrested twenty-eight times, almost three times his "estimate."
The evaluator diagnosed Kevin K. as suffering from "Alcohol Dependence, Partial Remission" and "Cocaine Abuse." Id. An in-patient treatment program was recommended. Id. at 3-4. Kevin K. did not want to go in-patient since working was his "first priority," but agreed to begin intensive out-patient treatment at Farrell Treatment Center ("Farrell"); if that was not successful in helping him remain substance-free, he agreed to go in-patient. His first appointment was scheduled for December 22, 1998. Id.
Notwithstanding his stated willingness to go to an intensive out-patient program, Kevin K. instead began a one-hour per session, once per week program at Farrell. An intensive out-patient program normally involves three to five sessions per week for two to three hours a session. He also obtained employment. He went to substance abuse counseling a few times and stopped. Then, he was incarcerated again. At trial, he acknowledged having a substance abuse problem.
3. Other Expectations
As noted, Lorie D. missed numerous appointments set up by DCF, including for visits and for substance evaluations or counseling. Frequently she was not available at the address she provided to DCF. CT Page 6894 Often her mother, who lived at the address, did not know where she was. She did not participate in parenting classes, although she was referred to CFS for this purpose.
Clearly, she did not comply with two other basic elements of the Expectations: avoiding the criminal justice system and not engaging in substance abuse. She was incarcerated twice after Farrah was removed. Recently, in 2000, she was convicted of possession of drug paraphernalia.
As to the issue of adequate housing, her family would not permit DCF to inspect the residence where her parents lived. She only briefly lived in an apartment on her own. At trial, she claimed her parents would now let DCF inspect the residence. As to employment, although she has applied, she remained unemployed as of the time of trial.
As to Kevin K., the final Specific Steps issued as to him in December, 1998 required him to address his parenting skills. Instead, he lost all contact with DCF and could not be located at the address he provided. He did not participate in parenting classes. He did not avoid the criminal justice system and was incarcerated at the time of trial.
Neither of her parents ever presented a meaningful plan for Farrah's care. Instead, since May, 1997, all of her care has had to be provided by others.
F. Evaluations by Dr. Freedman
Bruce Freedman, Ph.D., a psychologist, testified on the third day of trial. As a court-appointed evaluator, he conducted two psychological evaluations concerning the family, the first in July, 1997, prior to the neglect adjudication, and the second in January, 2000. His reports are Exhibits 5 and 6. Besides being a clinical psychologist, Dr. Freedman previously worked for four years as a drug abuse counselor and has had close to one thousand hours of training in substance abuse counseling.
In the 1997 evaluation, Lorie D. appeared to be gaunt and in poor health. Exh. 5 at 2. Her appearance and manner "were suggestive of the disorganization and distress seen with serious drug abuse." Id. at 3. She had trouble retaining answers to questions Dr. Freeman provided to her. Id. at 3. She appeared to be in a state of agitation and distress, and had limited ability to keep her emotions in check. Id. Her relationships with others appeared very unstable. Id. at 3-4. Overall, she "did not present a coherent or convincing account of her attempts to provide stability for her children." Id. at 4. Michael L. was also supposed to be evaluated but did not appear. Id. Although DNA testing had shown he was not Farrah's father, Lorie D. tried to depict him as such. Id. CT Page 6895
In summary, Dr. Freedman wrote of Lorie D. in July, 1997:
 Lorie was irresponsible, agitated and distressed, could become aggressive or assaultive at times, and she minimized her own problems or blamed them on others. She tended to hysterics, exaggerating or distorting reality to suit her own purposes, and lacking emotional stability or consistency in the handling of everyday life and child rearing. She did not seem financially, emotionally, or mentally ready to care for any of her children. Without substantial personal counseling and other help, she seemed headed for incarceration or serious health problems.
Id. at 14. Sadly, Dr. Freedman's prediction about future incarceration was accurate. He also noted that her relationship with Michael L. was "seriously troubled," and had included "domestic violence, drug abuse witnessed by children, and harsh and defective parenting of the children." Id. at 15. He also noted that Lorie D. had "resisted efforts to diagnose and plan treatment for her problems." Id. at 16. She showed various indicators of drug abuse. Id.
Dr. Freedman concluded, after the January, 2000 evaluation, that Lorie D. had made no progress toward rehabilitation. She had shown "an inability to focus her efforts toward reunification in an effective manner." Exh. 6 at 5. As she had recently emerged from prison, she had not yet had the chance to deteriorate. Given her long history of narcotic drug abuse, she was at risk to relapse. Possibly, she would be able to overcome this history after years of intensive treatment and vigilance. which had not yet occurred. In the case of relapse, which occurred previously, if children were in her care, they would be at risk and in danger, as they were in her care in the past. Once again, Dr. Freedman's prediction proved accurate. Subsequent to his January 7, 2000 evaluation, Lorie D. was arrested on January 31, 2000 for possession of drug paraphernalia, resulting in another conviction.
In the January, 2000 evaluation, Lorie D. claimed that her positive drug screens in 1999 had resulted from prescription medication. Exh. 6 at 2. This contradicted her admission of heroin usage to Mr. Flaherty in June, 1999.
In testing, Dr. Freedman found that she was articulate and had strong conceptual abilities and the potential to set goals and work toward them in an organized way. Id. at 3-4. He also found that "her pattern of disturbed relationships, substance abuse and involvement with substance CT Page 6896 abusers prevented her from realizing this potential in relation to her children." Id. at 4. While she was less emotionally distressed than when seen in 1997, she still presented herself in a scattered, disorganized way. Id. at 4. In his view, Lorie D. was not sufficiently motivated to do the things she needed to do.
Dr. Freedman also observed Lorie D. with Farrah in the interactional component of the evaluation. They were affectionate with one another, and talked animatedly together. Id. Farrah enjoyed the visit. She and her mother engaged in a variety of activities together. Id. Farrah was lively, talkative, and articulate with a "sunny, active disposition." Id. at 5. Dr. Freedman concluded, "the parent-child relationship seemed to have been sustained or restored during the recent monthly visits." Id. at 5. In summary, Lorie D. and Farrah "showed signs of a good visiting relationship." Id. at 5. He would not call their bond a strong one. He believed, for example, that if he had visited with Farrah previously, she probably also would have reacted well to him since she is a resilient child. Also, Lorie D. did not have to discipline Farrah. Any person with good skills could have entertained Farrah for one hour. Dr. Freedman did not observe Farrah with her foster parents, which he termed a deficiency in the overall evaluation process. Based on the way she looked and acted, Dr. Freedman concluded that Farrah would have to be attached to her foster parents.
In view of the fact that Farrah had been in foster care for most of her life, over two-and-a-half years at the time of his January, 2000 evaluation, he recommended no further efforts toward reunification. After all, Lorie D. had been incarcerated twice during Farrah's long time in placement. Id. at 6. Since her most recent release, she had not participated in drug treatment or testing. Id. at 7. Dr. Freedman stated that the length of placement and resulting uncertainty "were well beyond the recommended periods of time for children this young." Id. at 7. In his view, Farrah needs the security of a permanent home. Id. A child of age three, such as Farrah, should be in foster care no more than twelve to eighteen months.
In Dr. Freedman's opinion, Lorie D. was not in any condition to care for Farrah. If Farrah cannot stay in her foster home and were to be gradually engaged in a transition to a good preadoptive home, Dr. Freedman believes Farrah would likely do well and have a good chance of going on to a good future.
ADJUDICATION
A. Reunification
CT Page 6897
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. § 17a-112
(c)(1). The court need not make such a finding, however, "if a court has determined at a hearing pursuant to subsection (b) of section 17a-110
[dealing with permanency planning for committed children] that such efforts are not appropriate." Id. The word "reasonable" is the "linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof." (citation and internal quotation marks omitted.) In re Amber B.,56 Conn. App. 776, 784 (2000). Our Supreme Court has found that "reasonable" is a term which varies according to its context and is synonymous with equitable, fair, and just, citing Webster's New International Dictionary (2nd Ed.). State v. Antrim, 185 Conn. 118, 122
(1981) (citations omitted). More recently, in the termination of parental rights context, the Appellate Court stated that "reasonable efforts mean doing everything reasonable, not everything possible." (citations and internal quotation marks omitted) In re Savanna M., 55 Conn. App. 807,812-813 (1999); In re Jessica B., 50 Conn. App. 554, 566 (1998).
In accordance with § 17a-112 (c)(1), DCF may meet its burden concerning reunification in one of three ways: (1) by showing that it made such reasonable efforts; (2) by showing that the parent was unable or unwilling to benefit from reunification efforts; or (3) if the court previously determined that such efforts were not appropriate. As to Lorie D. and Kevin K., by clear and convincing evidence, DCF has sustained its burden in each of these three ways.
DCF made reasonable efforts to reunify Lorie D. with Farrah. Early on, she was referred to Dr. Freedman, whose evaluation identified key issues, primarily her ongoing drug abuse. DCF repeatedly referred her for substance abuse evaluations, which she did not attend. When she finally did so and tested positive, she failed to follow through with recommended treatment. Then, as Dr. Freedman predicted, she went to prison. After she was released, she began counseling at CFS, but relapsed, and went to prison again.
During this period of Lorie D.'s drug abuse and instability, Farrah's needs were met in foster care. DCF facilitated reunification by providing Lorie D. with regular opportunities to visit Farrah, when Lorie D. was not incarcerated and when she was. She was unable or unwilling to visit as often as permitted, and over time, visited very little.
Reunification must be a joint effort to be successful. Lorie D. did not CT Page 6898 actively engage in the process when the opportunity for reunification was there for her. The statutory duty to make reasonable efforts to reunify does not oblige DCF to accomplish a successful result. In re Natalia G.,54 Conn. App. 800, 803 (1999). Efforts at reunification require a constructive response from the parent if they are to be meaningful. In reSavanna M., 55 Conn. App. 807, 813 (1999). Here, either due to her unwillingness or inability to diligently work towards reunification, Lorie D. did not so respond.
Likewise, as to Kevin K., DCF made reasonable efforts to reunify him with Farrah. Although he had been named as her father in the May, 1997 neglect petition and preliminary Specific Steps were issued as to him, he was defaulted for failure to appear in September, 1997. His minimal efforts toward reunification have been discussed above. He saw Farrah on four occasions and went to a substance abuse evaluation after being released from prison. Intensive treatment was recommended. He declined, then went to a few sessions of counseling and stopped. He also stopped seeing Farrah in January, 1999. After that he became whereabouts unknown, lost contact with DCF, and eventually went to prison again.
The court is unpersuaded by his assertion that he thought his parental rights were terminated in early 1999. If he had talked with his attorney he would have found out that that was not so. His lack of credibility, as established by the CFS substance abuse evaluation, Exh. 9, also belies this contention.
Kevin K. did nothing between January, 1999 and the filing of the termination petition to be reunified with Farrah. Clearly, he was unable or unwilling to benefit from reunification efforts.
Thus, DCF has established that, under these circumstances, it made reasonable efforts to reunify Lorie D. and Kevin K. with their child and that each was unable or unwilling to benefit from those efforts. Moreover, the court's earlier determination, in September, 1999, that reunification efforts as to them were no longer appropriate, was clearly correct, amply supported, and should not be disturbed. Without question, DCF has satisfied its burden of proof as to reunification.
C. Statutory Grounds
To prevail in a non-consensual termination of parental rights case, DCF must also prove by clear convincing evidence that one of several statutory grounds for termination exists. See In re Michael B.,49 Conn. App. 510, 512 (1998), cert. denied, 247 Conn. 919 (1998). Conn. Gen. Stat. § 17a-112 (c)(3). CT Page 6899
DCF has alleged the grounds of abandonment as to Kevin K., and failure to rehabilitate and no ongoing relationship as to Lorie D. and Kevin K. As to Lorie D., the court finds that, by clear and convincing evidence, DCF has proved the ground of failure to rehabilitate, but not the ground of no ongoing relationship. As to Kevin K., DCF has proved each ground alleged by clear and convincing evidence.
1. Abandonment
General Statutes § 17a-112 (c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Abandonment focuses on the parent's conduct. . . . A lack of interest in the child is not the sole criterion in determining abandonment." (citations and internal quotation marks omitted In re Roshawn R.,51 Conn. App. 44, 52 (1998).
 The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance.
Id. at 53 (citations and internal quotation marks omitted).
"Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of a child." (citation omitted) In re Migdalia M., 6 Conn. App. 194, 208-209, cert. denied,199 Conn. 809 (1986). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id. at 209. The statutory term "`maintain' implies a continuing, reasonable degree of concern." Id. at 210.
More than a merely sporadic showing of interest, concern or responsibility for the child is required by the statute. In re AngellicaW., 49 Conn. App. 541, 551 (1998). The test is not limited to whether a parent has shown some minimal interest in the child. In re JuvenileAppeal (Docket No. 9489), 183 Conn. 11, 14-15 (1981); In re Rayna M.,13 Conn. App. 23, 36 (1987). Statutory abandonment, as opposed to common CT Page 6900 law abandonment, does not require proof of an intention to abandon totally or permanently. In re Shannon S., 41 Conn. Sup. 145, 151 (1989), aff'd per curiam, 19 Conn. App. 20 (1989). Moreover, parental "interest" in the child is not the criterion for the determination as to whether abandonment has occurred; rather, the statute requires interest, concern and responsibility "as to the welfare of the child." In re Rayna M.,supra, 13 Conn. App. 36-37.
Formerly, § 17a-112 (and its predecessor (§ 45-61f(d)) required a one-year period for an abandonment finding. In re Juvenile Appeal(Docket No. 10155), 187 Conn. 431, 441 (1982). P.A. 98-241 eliminated this requirement.
The court is mindful that incarceration does not constitute abandonment. In re Michael M., 29 Conn. App. 112, 120 (1990). However, "it is also not a shield against a finding of abandonment." In re Danual,1997 Ct. Sup. 4239, 4249 (April 2, 1997) (Brenneman, J.). The restrictions of incarceration "do not excuse a failure to make use of available though limited resources for contact with a distant child." Inre Juvenile Appeal (Docket No. 10155), supra, 187 Conn. 443.
As the court noted in In The Interest of Shantrise B.,1998 Ct. Sup. 11531, 11536 (October 15, 1998) (Schuman, J.), "[a] father's obligation to maintain contact with his children is not suspended during the pendency of a paternity test, especially when, as here, the father has a strong reason to believe that he is in fact the father." "In dealing with infant children, a critical element in evaluating the father's interest is the timing of his actions and his good faith actions in respect to the child." In The Interest of Courtney H., 1998 Ct. Sup. 7685, 7693 (June 22, 1998) (Foley, J.). "Promptness is measured in terms of the baby's life, not the onset of the father's awareness." (Internal quotations and citation omitted.) Id. at 7693-94. Clearly, "the need for both immediate child-care and prompt decision-making is of greatest urgency when it comes to the issue of newborn infants." Id. at 7694. This need "comports . . . with each child's biological and psychological need for unthreatened and unbroken continuity of care. . . ." Id. (quoting Goldstein, Medical Care for the Child at Risk: On State Supervision of Parental Autonomy, 86 Yale L. J. 645, 649 (1977), cited in In re JuvenileAppeal, (83-CD), 189 Conn. 276, 286 n. 11 (1983)). Accordingly, a father "is required to act expeditiously and in good faith to perfect his paternal rights." In The Interest of Courtney H., supra,1998 Ct. Sup. 7695.
Here, Kevin K. did not take such actions. He had good reason to believe he was Farrah's father when she was born in 1996, since Lorie D. informed him of the possibility when she was pregnant. Then, he was named as the CT Page 6901 father in the neglect petition in May, 1997. However, he waited for more than a year after Farrah was placed in foster care to seek contact with her. Then, he saw her four times, brought her some holiday gifts, and never saw her again after January, 1999. He had no contact with her thereafter. He never offered an acceptable plan for her care.
During the two years and five months after Farrah was placed in foster care, up to the October, 1999 filing of the termination petition, Farrah's needs had to be met by others. Thus, for long periods of time, Kevin K.'s actions did not even approach undertaking the obligations of parenthood. Without question, DCF has established by clear and convincing evidence that Kevin K. has failed to maintain a reasonable degree of interest, concern or responsibility for Farrah's welfare.
2. Failure to Rehabilitate
This statutory ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(B). The court previously has found Farrah to have been neglected, thus satisfying a statutory prerequisite.
The rest of the statute requires the court to find whether the facts encourage the belief that "such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112
(c)(3)(B). This portion of the statute requires the court to analyze a parent's rehabilitation "as it relates to the needs of the particular child" and determine whether such rehabilitation is foreseeable "within a reasonable time." In re Luis C., 210 Conn. 157, 167 (1989); In re HectorL., 53 Conn. App. 359, 366-67 (1999).
 `Rehabilitate' means "to restore [a handicapped or delinquent person] to a useful and constructive place in society through social rehabilitation.' [Webster's] Third New International Dictionary. The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of what which would CT Page 6902 reasonably encourage a belief that at some future date she can assume a responsible position in her child's life.
(internal quotation marks and citations omitted.) In re Eden F.,250 Conn. 674, 706, motion for en banc reargument denied, 251 Conn. 924
(1999).
As the Appellate Court recently noted In re Sarah Ann K.,57 Conn. App. 441, 448 (2000), the critical issue is whether the parent "has gained the ability to care for the needs of the particular child at issue." (internal quotation marks and citation omitted.) At the adjudicatory phase, the question is whether Lorie D. or Kevin K. was better able to be a parent to Farrah when the termination petition was filed than at the time of her commitment. See In re Michael M.,29 Conn. App. 112, 126 (1992). As noted, the termination petition was filed on October 22, 1999, two years and one month after the neglect adjudication on September 22, 1997.
This type of inquiry "require[s] the court to obtain a historical perspective of the respondent's child caring and parenting abilities." Inre Sarah Ann K., supra, 57 Conn. App. 449. Based on the foregoing discussion, the evidence is clear and convincing that Lorie D. and Kevin K. are not able to assume a responsible position in Farrah's life, nor could they become able to do so within a reasonable time. The foregoing discussion concerning the parents' efforts toward reunification, supra,
at 17-19, is relevant here as well and need not be repeated.
The evidence is overwhelming that Lorie D. did not comply with the court's Expectations, except in a very minimal way. She failed to keep many appointments set by DCF and occasionally failed to keep her whereabouts known. She failed to visit as often as permitted. As a result, she was never able to progress to a schedule of frequent, unsupervised visits. Consequently, it is unsurprising that she was unable to establish more than a good visiting bond with Farrah.
She never completed a substance abuse program. She did not become employed except to an infrequent and transitory extent. She did not establish stable housing on her own. When she lived with her parents, inspection of the home to ascertain its adequacy as a place for Farrah to live was declined. She engaged in substance abuse and went to prison twice after Farrah was placed.
While in prison, she was apparently a helpful volunteer with Ms. Herbert and she did avail herself of useful programmatic activities. However, there is no evidence that she has achieved anything close to the CT Page 6903 stability that would be evidence of rehabilitation.
In a case of this type, the court may reasonably rely on the opinion of an expert witness. In re Eden F., supra, 250 Conn. 706-707. As noted, Dr. Freedman's earlier prediction of incarceration for Lorie D. proved to be accurate. The court credits his assessments that, notwithstanding her potential, she manifested an inability to focus her efforts effectively toward reunification and she has not been rehabilitated. She previously relapsed after receiving treatment. She has not even begun intensive treatment, let alone shown that she can profit by it. Any child in her care would be at risk.
Similarly, Kevin K. did not comply with the Specific Steps issued by court concerning him. He did not engage in the recommended intensive treatment, then did not even keep up with less than intensive treatment. He did not visit Farrah except for four occasions, and he did not keep his whereabouts known. He did not maintain adequate housing and legal income; instead, he once again was involved with the criminal justice system. His daughter has no relationship with him.
In this type of inquiry, § 17a-112 (c)(3)(B) requires the court to focus on the "needs of the particular child." While Lorie D. and Kevin K. were making little progress toward rehabilitation, Farrah's needs had to be met by others. The record reflects that she is bonded to her foster family. Apparently, she is well-adjusted enough to enjoy visits with Lorie D. However, there is no evidence on which to believe that Lorie D. is someone who has or could assume a responsible role in her life. In view of his history and conduct, Kevin K. could not do so either.
The past must be seen as a basis for prediction of the future. In view of their failures to address the central issues in their lives, there is no basis on which to believe that either Lorie D. or Kevin K. had been rehabilitated when the petition was filed. They did little to make themselves available to Farrah or to avoid substance abuse and incarceration. There is no reason to believe that either will be rehabilitated within a reasonable time. Neither can assume a responsible position in Farrah's life, nor could they within the reasonable future.
3. No Ongoing Relationship
DCF also alleges that there are no ongoing parent-child relationships between Farrah and either of her parents. To prove this ground, DCF must show the absence of "the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and [that] to allow further time for the establishment or reestablishment of such CT Page 6904 parent-child relationship would be detrimental to the best interest of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(D); In re Savanna M.,55 Conn. App. 807, 815 (1999). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced." In re Juvenile Appeal (Anonymous),181 Conn. 638, 645 (1980) (internal citation omitted). The decisive question is "whether the child has no present memories or feelings for the natural parent." Id. at 646. As the Appellate Court recently noted, "the feelings of the child are of paramount importance." In re Tabitha T.,51 Conn. App. 595, 602 (1999). "Feelings for the natural parent connotes feelings of a positive nature only." Id.
Here, it is evident from Dr. Freedman's and Ms. Herbert's observations of Farrah's visits with her mother that they have a visiting relationship and that Farrah does have positive feelings for Lorie D. Accordingly, DCF has not proved this ground for termination as to her.
In contrast, in view of the fact that Kevin K. only saw Farrah four times, the most recent being in January, 1999, the evidence is clear and convincing that he has no ongoing relationship with her. He has no relationship with her at all. In view of Dr. Freedman's opinion that Farrah has been in placement for well over the recommended period and that she is in need of permanency, and in view of the fact that Kevin K.'s history evinces little reason to believe he could ever assume a parent-like role for Farrah, to allow further time for such a relationship to develop would be contrary to her best interest. This finding is made by clear and convincing evidence as well.
DISPOSITION OF THE TERMINATION PETITION
In the disposition phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat. § 17a-112
(c)(2); In re Juvenile Appeal (83-CD), 189 Conn. 276, 285 (1983). The court can consider all events occurring through the close of the disposition hearing. Practice Book § 33-5.
Because of the deleterious effects of prolonged temporary placement, "time is of the essence," for Farrah. In re Antony B., 54 Conn. App. 463,476 (1999); In re Alexander V., 223 Conn. 557, 565 (1992). The Appellate Court has "consistently held that to allow a child to languish in foster care is not in the child's best interest." In re Drew R., 47 Conn. App. 124,131 (1997). Our Supreme Court has noted that "long-term stability is critical to a child's future health and development." (citation omitted) CT Page 6905In re Eden F., supra, 250 Conn. 709. A child's need for permanency also has been recognized by the Appellate Courts. In re Teshea B., Conn. App. 490, 493 (1987).
Permanency is critical for Farrah. As Dr. Freedman noted, she has been in a temporary situation well beyond the recommended period of time. She is bonded to her foster parents, but has begun a transition aimed at being placed with John and Kathy K., her paternal aunt and uncle, who would like to adopt her.
The evidence is clear and convincing that termination is in Farrah's best interests. For good reasons, she has not been in either of her parents' care since May, 1997, now over three years, which is the substantial majority of her life. For two years she has been in the same supportive foster home; now she has a good chance for permanency in a new home.
Here, there is no reason to believe that either Lorie D. or Kevin K. can ever assume meaningful parental roles in her life. To the contrary, each has wasted the opportunity to do so. That the pull of substance abuse and other, related problems in their lives has led to this conclusion is a tragedy for them, as it is for Farrah. However, Farrah is still very young and, with careful planning, and the benefits of permanency and stability, should have a bright future. To deny termination would leave Farrah in prolonged foster care for no reason. As a result, she could be subjected to further legal proceedings concerning her guardianship when she is older, of which she could become aware, and which could be disruptive to her development. Since she is entitled to permanency and since time is of the essence, termination is in her best interest.
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17-112 (d). See In re Tabitha P., Conn. App. 353, 362 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the court finds that DCF provided services to both parents. of most importance, they were provided with substance abuse evaluations and treatment opportunities.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of CT Page 6906 1980.
Based on the foregoing discussion, the court finds that DCF made reasonable efforts to reunify Farrah with her parents. Such efforts became futile and inappropriate due to their inability or unwillingness to benefit from them.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
Based on the foregoing discussion, the court finds that Lorie D. and Kevin K. failed to comply with key elements of the court-ordered Expectations and Specific Steps, the terms of which were described supra
at 2-4. The extent of their lack of compliance is discussed above at 4-5 and 6-13. DCF complied with its obligations as to them.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person who has exercised care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
Based on the foregoing discussion, the court finds that Farrah is bonded to her foster parents. She is willing to visit with her mother and enjoys doing so. However, she is not bonded to her to the extent of looking to her to meet her everyday needs for nurturing and support. She has no relationship to or bond with Kevin K. Farrah has also developed affection for John and Kathy K., her paternal aunt and uncle.
5) The age of the child.
Farrah is just over three years and nine months old. She has lived the substantial majority of her life in foster care. Leaving her in the uncertainty of foster care would not be in her best interest.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that neither Lorie D. nor Kevin K. has made reasonable efforts to adjust her or his CT Page 6907 circumstances or conditions to make it in Farrah's best interest to be placed with either of them in the foreseeable future. Neither has addressed the substance abuse issues which permeate their lives. Kevin K. will remain incarcerated until early 2001. Both have unstable existences which could lead them back to prison in the near future. Neither presented a viable plan for caring for Farrah. Both had less than adequate histories of visiting Farrah or keeping in contact with her.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
Based on the foregoing discussion, neither Lorie D. nor Kevin K. faced unreasonable interference from anyone or from economic circumstances. Their respective circumstances were the results of their own actions and failures to act.
CONCLUSION
Based upon the foregoing findings, the court determines that it is in the best interest of Farrah P. for termination of parental rights to enter with respect to the mother, Lorie D., and the father, Kevin K. Accordingly, the court hereby grants the petition to terminate the parental rights of Lorie D. and Kevin K.
The court further orders that the Commissioner of DCF is appointed statutory parent to Farrah P. The Commissioner shall file with this court no later than sixty days following the date of judgment a written report of efforts to effect permanent placement and file the further reports as are required by state and federal law.
It is so ordered.
BY THE COURT
ROBERT B. SHAPIRO JUDGE OF THE SUPERIOR COURT